# United States Court of Appeals for the Federal Circuit

FILED
NOV 15 2007
U.S. COURT OF FEDERAL CLAIMS

2006-5051

CIENEGA GARDENS, DEL AMO GARDENS, LAS LOMAS GARDENS, BLOSSOM HILL APARTMENTS, and SKYLINE VIEW GARDENS,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

---

2006-5052

CHANCELLOR MANOR, GATEWAY INVESTORS, LTD., and OAK GROVE TOWERS ASSOCIATES,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

## Judgment

ON APPEAL from the United States Court of Federal Claims

in CASE NO(S). 94-CV-1, 94-CV-10004, 94-CV-10009, 94-CV-10013, 94-CV-10029, 98-CV-39, 98-CV-3911, and 98-CV-3912

This CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

**VACATED AND REMANDED**

ENTERED BY ORDER OF THE COURT

DATED SEP 2 5 2007

Jan Horbaly, Clerk

**ISSUED AS A MANDATE:** NOV 1 6 2007

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

By: Date: 11/16/07

# United States Court of Appeals for the Federal Circuit

2006-5051

CIENEGA GARDENS, DEL AMO GARDENS, LAS LOMAS GARDENS, BLOSSOM HILL APARTMENTS, and SKYLINE VIEW GARDENS,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

---

2006-5052

CHANCELLOR MANOR, GATEWAY INVESTORS, LTD., and OAK GROVE TOWERS ASSOCIATES,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

Richard P. Bress, Latham & Watkins, of Washington, DC, argued for plaintiffs-appellees in 2006-5051. Of counsel on the brief were Everett C. Johnson, Jr., Leonard A. Zax, Matthew K. Roskoski, Amanda P. Biles, and Susan S. Azad, of Los Angeles, California.

Kenneth M. Dintzer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant in 2006-5051. With him on the brief were Peter D. Keisler,

Assistant Attorney General, and David A. Harrington, Trial Attorney. Of counsel was Michael D. Austin, Trial Attorney.

Michael E. Malamut, New England Legal Foundation, of Boston, Massachusetts, for amicus curiae in 2006-5051, New England Legal Foundation.

William L. Roberts, Faegre & Benson LLP, of Minneapolis, Minnesota, argued for plaintiffs-appellees in 2006-5052. With him on the brief were Michael F Cockson and Martin S Chester. Also on the brief were Jeff H. Eckland, Mark J. Blando, and David S. Laidig, Eckland & Blando LLP, of Minneapolis, Minnesota. Of counsel was Jerry W. Snider, Faegre & Benson LLP, of Minneapolis, Minnesota.

Kenneth M. Dintzer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant in 2006-5052. With him on the brief were Peter D. Keisler, Assistant Attorney General, Brian M. Simkin, Assistant Director, David A. Harrington, Kenneth D. Woodrow, and Timothy P. McIlmail, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Judge Charles F. Lettow

# United States Court of Appeals for the Federal Circuit

2006-5051

CIENEGA GARDENS, DEL AMO GARDENS, LAS LOMAS GARDENS, BLOSSOM HILL APARTMENTS, and SKYLINE VIEW GARDENS,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

---

2006-5052

CHANCELLOR MANOR, GATEWAY INVESTORS, LTD., and OAK GROVE TOWERS ASSOCIATES,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

---

DECIDED: September 25, 2007

---

Before MICHEL, Chief Judge, NEWMAN, Circuit Judge, ARCHER, Senior Circuit Judge, SCHALL, GAJARSA, LINN, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK. Dissenting opinion filed by Circuit Judge NEWMAN.

DYK, Circuit Judge.

These cases involve takings claims resulting from the enactment of the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, § 202, 101 Stat. 1877 (1988) ("ELIHPA"), and the Low-Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, 104 Stat. 4249 (1990) ("LIHPRHA"). The Court of Federal Claims held that the enactment of these statutes effected a taking. Cienega Gardens v. United States, 67 Fed. Cl. 434 (2005) ("Cienega IX"). Because we conclude that the Court of Federal Claims, notwithstanding its careful opinion, erred in certain respects in its legal analysis, we vacate and remand for further proceedings.

## BACKGROUND

These consolidated cases return to us after remands in Cienega Gardens v. United States, 331 F.3d 1319, 1324 (Fed. Cir. 2003) ("Cienega VIII") and Chancellor Manor v. United States, 331 F.3d 891, 893 (Fed. Cir. 2003). The pertinent history may be briefly described.

### I

In 1934 Congress, concerned with the declining national stock of affordable

housing, enacted the National Housing Act.[1] Pub. L. No. 73-479, § 1, 48 Stat. 1246 (1934). Until the 1960s, the National Housing Act primarily subsidized the projects of local public housing authorities. In 1961 Congress amended the National Housing Act to "enable private enterprise to participate to the maximum extent in meeting the housing needs of moderate-income families." S. Rep. No. 87-281, at 4 (1961), as reprinted in 1961 U.S.C.C.A.N. 1923, 1926; see Pub. L. No. 87-70, § 101(a)(6), 75 Stat. 149, 149-50 (1961) ("section 221(d)(3)"). Congress amended section 221(d)(3) in 1968 ("section 236"). Pub. L. No. 90-448, § 201, 82 Stat. 476, 498-501 (1968). The newly enacted section 221(d)(3) and section 236 programs provided financial incentives to private investors for the creation of additional low income housing. These financial incentives were threefold.

First, the programs provided below-market-rate mortgages. Under section 221(d)(3), the owners of low-income housing projects entered into mortgage contracts with private lenders at the market rate. Once the project was completed, the mortgages were purchased by the Federal National Mortgage Association ("FNMA"). The FNMA, using government subsidies, then reduced the original rate, charging below-market rates to the owners. See Pub. L. No. 87-70, § 101(c), 75 Stat. 149, 153 (1961). Under section 236, the owners also contracted for mortgages with private lenders, but the government directly subsidized the interest payments to the lender. See Pub. L. No. 90-448, § 201, 82 Stat. 476, 498-501 (1968). The programs permitted the owners to borrow ninety percent of the overall cost of the project. The mortgage contracts were

---

[1] The National Housing Act established the Federal Housing Administration (FHA). In 1965 the Federal Housing Administration was subsumed into the then newly

for forty-year mortgages and included an option to prepay the mortgage without HUD approval after twenty years. The regulations under the statute were consistent with these contracts, including providing for prepayment without HUD approval after twenty years. 24 C.F.R. §§ 221.524, 236.30 (1970); see Cienega Gardens v. United States, 194 F.3d 1231, 1243-44 (Fed. Cir. 1998) ("Cienega IV").

Second, to encourage lending both sections 221(d)(3) and 236 authorized the FHA to insure mortgages in order to protect lenders against default. See Pub. L. No. 90-448, § 201, 82 Stat. 476, 498-501 (1968); Pub. L. No. 87-70, § 103, 75 Stat. 149, 158 (1961).

Finally, the owners were entitled to a "Builder's and Sponsor's Profit and Risk Allowance" ("BSPRA"), which was a payment from HUD to the owner toward the owner's down payment. The BSPRA was calculated as ten percent of the "actual cost" of construction.

In addition to the direct incentives provided under sections 221(d)(3) and 236, entities who entered into these programs received substantial tax benefits. At that time, the tax laws permitted accelerated depreciation for real estate projects over the real economic life of the property, allowing the general and limited partners to take large income tax deductions in the earlier years of the investment. While these tax benefits were not particular to section 221(d)(3) and section 236 properties, the benefits were particularly significant under these programs because the properties were highly leveraged so that the tax benefits the partners received were substantial in comparison to their limited investment.

---

established Department of Housing and Urban Development. See 24 C.F.R. §§ 200.1,

To ensure that the housing created by the programs would continue to be used for low-income families, Congress provided that the Department of Housing and Urban Development ("HUD") would regulate the operation of the low-income housing projects. Under both programs, the owner and HUD entered into a regulatory agreement where any important management decisions, including increases in rents, had to be approved by HUD. See Pub. L. No. 90-448, § 201, 82 Stat. 476, 498-501 (1968). The agreements, under which HUD provided mortgage insurance and various subsidy payments, restricted the owners' annual return to six percent of their initial equity investment in the property. This six percent dividend was not limited to the owners' net cash investment in the property, which was only 1.8 to 3 percent of the value of the property, but was six percent of the initial equity investment. See Cienega IX, 67 Fed. Cl. at 440. The initial equity investment included the government's BSPRA contribution, and the equity was not reduced by the tax benefits received. Id. Accordingly, the six percent dividend on the initial equity in the property (the cash investment and the BSPRA), could represent as much as a twenty-five percent return on the owner's actual net cash investment.

The restrictions of the regulatory agreements were effective for as long as HUD insured the mortgage on the property, i.e., until the mortgage was paid off. The exercise of the prepayment right under the mortgage agreement with the mortgage lender would thus have the effect of terminating the regulatory agreement. For example, the Chancellor Manor regulatory agreement stated that "[i]n consideration of the endorsement for insurance . . . Owners agree [to the restrictions set forth in the

---

200.2 (1994).

agreement]. . . so long as the contract of mortgage insurance continues in effect . . . or during any time the Commissioner is obligated to insure a mortgage on the mortgaged property." Chancellor Manor J.A. 500165. As discussed below, there is a question whether prepayment rights, as opposed to the other benefits of the transactions, played a significant role in the owners' decision to invest in the property.

The owners of these projects were typically limited partnerships. This allowed the owners to "pass through" the entity's tax losses primarily to the limited partners. Along with the general partners, the limited partners also received a pro rata share of the annual six percent dividend. The plaintiffs here consist of eight partnerships: Cienega Gardens, Del Amo Gardens, Las Lomas Gardens, Blossom Hill Apartments, Skyline View Gardens, Chancellor Manor, Oak Grove Towers Associates, and Gateway Investors, Ltd. The prepayment restrictions on their mortgages were set to expire between July 15, 1991, and June 6, 1995.

II

In the 1980s, Congress became concerned that as prepayment dates arrived the limited partnerships would prepay the mortgages; that the restrictions imposed during the mortgage period would expire; and that the housing stock represented by these projects would be withdrawn from the low-income market and converted to traditional apartment units, rented at market rates. Congress reacted with a carrot-and-stick approach, first enacting ELIHPA in 1988 (a temporary measure), and then superseding this statute by LIHPRHA in 1990 (initially planned as a permanent measure). In enacting these statutes, Congress sought to "balance the public policy need to preserve housing for low income families with the perceived contractual rights of the owners."

H.R. Rep. No. 101-559, at 75 (1990).

LIHPRHA was enacted on November 28, 1990, and is the most pertinent legislation. Under LIHPRHA, Congress restricted the rights of owners by requiring them as a condition of exiting the program to offer their property for sale to owners that would preserve the rent restrictions and barring the owners from exiting the programs (by effectively barring prepayment of the mortgages) while the properties were offered for sale. See 12 U.S.C. § 4110 (2000).[2] For a fifteen-month period, the owners were required to sell the property at the "the fair market value of the housing based on the highest and best use of the property" to particular organizations that would agree to preserve the rent restrictions. Id. §§ 4103(b)(2), 4110. After the fifteen month offer period, if there had been no sale, the owners were permitted to prepay the mortgages. Id. § 4114(a)(2). If HUD approved the sale, HUD provided the purchaser with financial assistance. Id. § 4110(d)(3). If HUD failed to provide assistance to the purchasers, the owners could prepay the mortgage. Id. § 4114(a)(1)(B). While the mortgages could not be prepaid during the sale period, LIHPRHA permitted the owners to commence the sale process up to two years before their prepayment eligibility date. Id. § 4119(1)(B).

---

[2] LIHPRHA provided that owners could immediately prepay (without offering the properties for sale) with HUD approval. However, HUD was only permitted to approve immediate prepayment upon finding that the effect of prepayment would not "materially increase economic hardship for current tenants," including a finding that alternative housing was available for current tenants and that the supply of vacant, comparable housing would not be affected. 12 U.S.C. § 4108(a). The Court of Federal Claims found that this was not a viable alternative for the markets involved here because "HUD could not make the factual findings that were a necessary predicate for prepayment approval." Cienega IX, 67 Fed. Cl. at 467. The record supports this finding. We will not address this option further since it was not available to the owners as a practical matter. See also Cienega Gardens v. United States, 265 F.3d 1237, 1239 (Fed. Cir. 2001) ("Cienega VI") (holding that the model plaintiffs' claims were ripe even though they did not seek approval from HUD to prepay the mortgages).

Accordingly, if an owner promptly filed its notice of intent and if the sale process took approximately two years to complete,[3] the owner could sell the property or prepay the mortgage near the prepayment eligibility date. However, the statute imposed two additional restrictions. If prepayment occurred, the owners could not raise rents for three years following prepayment and the owners were required to pay at least fifty percent of any displaced, low-income family's relocation expenses. Id. § 4113(b), (c)(1).

Congress also provided a carrot to those owners willing to stay in the program. Owners could elect to receive financial incentives by signing a "use agreement" with HUD. Id. § 4109. These incentives included limited increases in rents, increased access to residual receipts accounts, repair and capital improvement loans from HUD, HUD-insured loans that enabled owners to access equity in their properties through a second mortgage, and an increased allowed rate of return. Id. § 4109(b); see Cienega

---

[3] The parties dispute precisely how long it would take to complete the sale process. The Court of Federal Claims did not make explicit factual findings regarding the duration of the sales period, but it stated that "[a] sale would take two years or more to complete." Cienega IX, 67 Fed. Cl. at 478. This statement was supported by testimony offered by the plaintiffs that "in some cases" it would "take approximately" two years to process a sale. J.A. 103237.

The two-year timeframe is supported by the deadlines set forth in the regulations. LIHPRHA permitted owners to file a notice of intent to sell the property twenty-four months before their original twenty-year prepayment eligibility date. 12 U.S.C. § 4119(1)(B) (2000). The owner's and HUD's appraisals were due within four months of the date that the owner filed the notice of intent. 24 C.F.R. § 248.111(i). If the owner and HUD did not agree on the appraisal value, they selected a third appraiser whose appraisal was due four months later. Id. § 248.111(j). Within one more month, HUD informed the owner whether it would approve the sale. Id. § 248.131(b). HUD then directed the owner to submit a second notice of intent. Id. § 248.131(b)(6). The owner submitted the second notice of intent within a month, which triggered the fifteen-month offer period. Id. § 248.133(b). Thus, according to the timeline set forth in the regulations, the process should take approximately twenty-five months.

IX, 67 Fed. Cl. at 442; 24 C.F.R. § 248.231. In exchange for these incentives, owners had to agree to maintain the remaining restrictions "for the remaining useful life of such housing."[4] 12 U.S.C. § 4112(a)(2)(A) (2000).

III

None of the plaintiffs here elected to pursue the sale option, and only four of the plaintiffs entered into use agreements after ELIHPA expired but during the period that LIHPRHA was in effect.[5] All of the plaintiff owners brought suit in the Court of Federal Claims claiming, inter alia, that the enactment of ELIHPA and LIHPRHA, by restricting the owners' right to prepay and exit the program, constituted a taking and a breach of contract. The plaintiffs filed two separate actions—one brought in part by the Cienega Gardens plaintiffs[6] and one brought by the Chancellor Manor plaintiffs.[7] See

---

[4] Under LIHPRHA's transition provisions, any owner of housing that became eligible for low-income housing before January 1, 1991, who, before such date, filed a notice of intent under section 222 of ELIHPA could elect to proceed under either ELIHPA or LIHPRHA. Pub. L. No. 101-625, § 604 (codified as amended at 12 U.S.C. § 4101 note (Transition Provisions) (2000)). Any owner that elected to enter into a use agreement under the terms of ELIHPA was required to maintain the restrictions until the end of the forty-year mortgage. Pub. L. No. 100-242, § 224.

[5] These owners are Cienega Gardens, Del Amo Gardens, Las Lomas Gardens, and Chancellor Manor.

The government argues on appeal that these plaintiffs waived the right to bring a takings claim by entering into use agreements. We find no error in the Court of Federal Claims finding that there was no waiver, and therefore reject the government's argument. See also Independence Park Apartments v. United States, 449 F.3d 1235, 1247 (Fed. Cir. 2006) ("there is no indication in the use agreements that [the plaintiffs] were relinquishing their right to sue for damages caused by ELIHPA and LIHPRHA").

[6] Cienega Gardens, Del Amo Gardens, Las Lomas Gardens, Blossom Hill Apartments, and Syline View Gardens.

[7] Chancellor Manor, Gateway Investors, Ltd., and Oak Grove Towers

Chancellor Manor v. United States, 51 Fed. Cl. 137 (2001); Cienega Gardens v. United States, 33 Fed. Cl. 196 (1995) ("Cienega I").

On March 28, 1996, after the Cienega Gardens lawsuit was filed but before the Chancellor Manor lawsuit was filed, and after the four plaintiffs had signed use agreements, Congress enacted the Housing Opportunity Program Extension Act of 1996, Pub. L. No. 104-120, 110 Stat. 834 (1996) ("HOPE"), which restored prepayment rights. Id. § 2(b). Congress enacted the appropriations statute for HUD one month later, on April 29, 1996, which included an express provision allowing an owner to prepay. Pub. L. No. 104-134, 110 Stat. 1321-265 to 1321-293 (1996).[8] These provisions did not affect the previously executed use agreements.

Thus, as of April 29, 1996, the statute provided that the plaintiffs that had not entered into use agreements with HUD were free to prepay their mortgages and exit the program, although HOPE provided that owners that prepaid could not raise rents for an additional two months after prepayment. See § 2(b), 110 Stat. at 834-35. The plaintiffs that did enter into use agreements remained bound to maintain the restrictions either until the end of the forty-year mortgage (Cienega Gardens, Del Amo Gardens, Las Lomas Gardens) or for the useful life of the property (Chancellor Manor). 12 U.S.C. §

---

Associates.

[8] Later appropriations statutes reiterated the prepayment right. See Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, Pub. L. No. 105-276, § 219, 112 Stat. 2461, 2487-88 (1998); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, Pub. L. No. 104-204, 110 Stat. 2874, 2884 (1996) (codified at 12 U.S.C. § 4101 note (2000)). The 1998 appropriations statute added the condition that owners must provide 150 days' notice before prepaying under HOPE.

4112(a)(2)(A) (2000).

IV

In the course of the two litigations we established that the government, by limiting the prepayment rights, did not incur liability to the owners for breach of contract because HUD was not a party to the mortgage agreements. Chancellor Manor, 331 F.3d at 901; Cienega IV, 194 F.3d at 1234, 1246. This left only the takings claims to be resolved. After an initial decision by the Court of Federal Claims in the Cienega Gardens litigation and a further remand by this court,[9] the Court of Federal Claims selected four model plaintiffs (Sherman Park Apartments, Independence Park Apartments, Pico Plaza Apartments, and St. Andrews Gardens Apartments) in the Cienega Gardens litigation. See Cienega Gardens v. United States, 38 Fed. Cl. 64 (1997) ("Cienega III"). The court entered judgment in favor of the government with respect to all plaintiffs. Cienega Gardens v. United States, No. 94-1C (Fed. Cl. Jan. 8, 2002). It did not render a detailed opinion but essentially followed its decision in

---

[9] After the initial remand, the Court of Federal Claims granted summary judgment in favor of the government on the takings claims on the ground that the model plaintiffs' claims were not ripe because the owners did not exhaust their administrative remedies by requesting permission from HUD to prepay the mortgages before bringing suit. Cienega Gardens v. United States, 46 Fed. Cl. 506 (2000) ("Cienega V"). We rejected that argument on appeal and found that the model plaintiffs' claims were ripe. Cienega VI, 265 F.3d at 1239. We again remanded for consideration of the model plaintiffs' regulatory takings claims. Id.

Here the government again argues that the plaintiffs' claims are not ripe. The government argues that: (1) plaintiffs did not petition HUD for prepayment approval, and (2) they did not pursue the sale option. We reject these arguments. In light of our holding in Cienega VI and the factual findings made by the Court of Federal Claims, see Cienega IX, 67 Fed. Cl. at 460-61, we find that it would have been futile for the owners to apply to HUD for approval to prepay. Moreover, the ripeness doctrine does not require the owners to apply for voluntary incentives such as the sale option that they did not wish to pursue. While these incentives are pertinent to the Penn Central

Alexander Investment v. United States, 51 Fed. Cl. 102 (2001). Alexander Investment held, inter alia, that similarly situated plaintiffs had no property interest that could be subject to a taking because HUD had reserved the right to amend the regulations governing sections 221(d)(3) and 236 and thus to alter the prepayment right. Alexander Investment, 51 Fed. Cl. at 107; see 24 C.F.R. §§ 221.749, 236.249 (1970). Alternatively, the Court of Federal Claims in Alexander Investment held that there was no regulatory taking under Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978). The court found that there was no significant economic impact because "[t]he change in regulation did not remove the property from [the owner's] possession . . . . They continued to operate low-income housing." Alexander Investment, 51 Fed. Cl. at 109. Moreover, the plaintiffs did not demonstrate an investment-backed expectation because they "could have anticipated that Congress might concern itself with the possibility of a low-income housing shortage and act to prevent or delay such a shortage." Id. at 110.

On appeal, we reversed, based on a partial record and limited arguments made by the government, finding that the four model plaintiffs had suffered a compensable temporary regulatory taking and remanding with respect to the others. See Cienega Gardens v. United States, 331 F.3d 1319, 1324 (Fed. Cir. 2003) ("Cienega VIII"). Cienega VIII decided several issues that are equally applicable to all parties in these cases.

First, regarding the character of the government action, we held that to constitute a compensable taking the statute need not "appropriate the owners' titles or dispossess

---

factors, they are not relevant to the ripeness analysis.

them in any way," id. at 1339, nor does the restriction have to be permanent. Id.

Second, we disagreed that the plaintiffs needed to establish "that the prepayment restrictions denied them all economically beneficial use of their property in order for the takings to be compensable." Id. at 1343. We stated that "it is clearly not the law that only such 100% value regulatory takings are compensable." Id.

Third, we rejected the government's argument that the plaintiffs reasonably should have expected that the prepayment right would be eliminated because "plaintiffs knew that they were entering a sensitive and highly regulated field that was subject to continuing congressional interest and attention." Id. at 1350. We explained that "the fact that the industry is regulated [is not] dispositive" and that "all regulatory changes are [not] reasonably foreseeable." Id. We concluded that the owners could not reasonably have expected the change in the regulatory approach. Id.

In other respects, the holdings of Cienega VIII were unique to the four model plaintiffs and based on the particular arguments that the government made. Thus, for example, the trial court assumed that the appropriate approach was to consider the taking on a year-to-year basis by comparing lost income under the regulations to a market rate of return. Id. at 1343 n.38. We stated that "the government neither argues error in the trial court's adoption of the plaintiffs' expert's calculation of rate of return value, nor error in the trial court's repeated rejection of the government's data." Id. at 1343 n.40. Based on this assumption, we calculated that the model plaintiffs earned a return on their equity investment in the property that was about ninety-six percent less than what they could have earned by investing their money elsewhere. Id. at 1343. Thus we found that "the Model Plaintiffs' expert's calculations . . . proved sufficient

financial loss on the part of the Model Plaintiffs . . . , especially in view of the lack of any specific challenge by the government of the trial court's findings or of the Model Plaintiffs' methods and data." Id. at 1345.

The court in Cienega VIII did not resolve the takings issue with respect to the non-model Cienega Gardens plaintiffs, and we remanded for consideration of the other plaintiffs' takings claims. We expressly stated that the resolution of these aspects of the model plaintiffs' case did not preclude a different result for the non-model plaintiffs based on different arguments and a different record:

> The government has essentially waived any right to assert any errors in the Model Plaintiffs' arguments. Therefore, to the extent that the government can demonstrate affirmative errors through reference to additional evidence and flaws in the arguments in future cases in which plaintiffs make the same arguments, this opinion should not be understood to bar future courts from also considering that evidence and those arguments.

Cienega VIII, 331 F.3d at 1337 n.31. Accordingly, we instructed the Court of Federal Claims on remand to "allow the [government and remaining plaintiffs] to develop an appropriate record and to rule on liability." Id. at 1354. We noted that "[o]n remand, the court may of course consider any materials presented by either party in furtherance of its case that are relevant under regulatory takings case law." Id.

We agreed with the Cienega VIII analysis in our decision in Chancellor Manor, 331 F.3d at 904-07. There we also remanded to the Court of Federal Claims for further factual findings pertinent to the Penn Central factors, concluding:

> [i]n rejecting the plaintiffs' and defendants arguments based on this record and by remanding for a more searching factual inquiry, we have not predetermined the question of whether the plaintiffs will be able to establish the existence of a regulatory taking under the Penn Central standards. . . . At this stage we have done no more than reject the arguments of both the United States and the Owners that this matter can

be properly decided on the present record.

Id. at 906-07.

On remand, the Court of Federal Claims consolidated the suits of the five remaining Cienega Gardens plaintiffs with the three Chancellor Manor plaintiffs. Cienega IX, 67 Fed. Cl. at 437-38. After conducting a bench trial, the court issued an opinion on August 29, 2005, finding that the government's actions constituted a temporary regulatory taking. Id. at 438. On November 22, 2005, the court issued an order awarding just compensation.[10]

For present purposes, four aspects of the Court of Federal Claims decision are particularly pertinent. First, the court did not consider the impact of the regulation on the value of the property as a whole. The question the court asked was, for each year that the restriction was in effect, whether there was a compensable taking of income from the property. In determining the effect of the statute on the owners, the court

---

[10] The court calculated damages up until the end of the takings period or until the date of the judgment, whichever was earlier. Accordingly, the court awarded the following damages:

| Plaintiff | End of Takings Period or September 30, 2005 (date of judgment) | Amount of Just Compensation Awarded |
|---|---|---|
| Cienega Gardens | Oct. 10, 2002 | $7,219,000 |
| Del Amo Gardens | Sept. 30, 2005 | $5,008,814 |
| Las Lomas Gardens | Sept. 30, 2005 | $13,017,377 |
| Blossom Hill Apartments | Feb. 17, 1997 | $2,801,347 |
| Skyline View Gardens | Feb. 17, 1997 | $2,228,032 |
| Chancellor Manor | Sept. 30, 2005 | $10,510,121 |
| Oak Grove Towers | Mar. 1, 1997 | $1,464,761 |
| Gateway Investors (Rivergate) | Mar. 1, 1997 | $1,697,241 |

applied a "return on equity approach," which compared the return the owner received on its investment for a one-year period under the regulations to a hypothetical return on its investment without the regulations. In other words, the court compared the owners' actual return under LIHPRHA, which was limited to a six percent return on the initial equity investment, to the return that the owner could have received on the total equity in its property without the restriction (twenty years of mortgage payments having increased the owner's equity). Id. at 475. The Court of Federal Claims found that this restriction of income during a discrete annual period was a significant financial detriment to the owners. Thus the return on equity approach treated the income from the property for each individual year as a separate property interest from the value of the property as a whole.

Second, the Court of Federal Claims did not factor into the takings analysis the offsetting benefits afforded under ELIHPA and LIHPRHA. The Court of Federal Claims noted that ELIHPA and LIHPHRA provide two options that operate in lieu of the contractual prepayment right: (1) selling the property at the fair market value to a HUD-approved purchaser or prepaying the mortgage in the absence of a sale, or (2) signing a use agreement. Cienega IX, 67 Fed. Cl. at 467. The Court of Federal Claims held that these benefits should not be taken into account in determining whether a taking occurred, though they were relevant in determining the amount of just compensation. Id. at 470.

Third, the court did not include, as a factor in its analysis, the limited duration of ELIHPA and LIHPRHA, and the restrictions that these statutes imposed. The court

calculated the annual return on equity for discrete periods beginning at the original prepayment date. Id. at 476. The court only considered the duration of the restriction for the purpose of calculating just compensation.

Finally, the court considered the reasonable investment-backed expectations of the property owners. Id. at 471. The court first addressed the plaintiffs' subjective expectations in entering into the programs. Id. at 471-72. The court concluded that both groups of plaintiffs "expected to prepay when they invested in their properties." Id. The court then found that the owners' expectations of prepayment were reasonable "given the deed of trust notes, the existing regulations, the type of properties involved, the location of the properties, and the importance of an exit strategy in entering such a program." Id. at 474. The court did not consider whether there was a nexus between the owners' expectations and their investment in the property.

The government timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2000).[11] We now order the cases consolidated for purposes of this appeal.

DISCUSSION

We review the Court of Federal Claims' legal determinations without deference and its findings of fact for clear error. Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1365 (Fed. Cir. 2004). Whether a compensable taking under the Fifth Amendment has occurred is a question of law that is based on factual determinations.

---

[11] Given the interrelation between the two cases and because two separate panels heard the prior appeals, we heard this appeal as a seven-judge panel pursuant to our statutory authority under 28 U.S.C. § 46(b), which provides that the "Federal Circuit . . . may determine by rule the number of judges, not less than three, who constitute a panel." See also Fed. Cir. R. 47.2(a) ("Cases and controversies will be heard and determined by a panel consisting of an odd number of at least three judges, two of whom may be senior judges of the court.").

Id.

We deal here with an alleged regulatory taking rather than a physical taking. The focus of the regulatory takings analysis is on fundamental fairness—is it fair for the government to impose the cost of a regulation on private parties rather than on the public as a whole through public spending? See Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001); Penn Cent., 438 U.S. at 123. To make this determination, there is no set formula. "[T]here simply is no bright line dividing compensable from noncompensable exercises of the Government's power when a regulatory imposition causes a partial loss to the property owner. What is necessary is a classic exercise of judicial balancing of competing values." Fla. Rock Indus., Inc. v. United States, 18 F.3d 1560, 1570 (Fed. Cir. 1994). Thus the regulatory takings analysis is "characterized by an 'essentially ad hoc, factual inquir[y]' . . . designed to allow 'careful examination and weighing of all the relevant circumstances.'" Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Authority, 535 U.S. 302, 322 (2002) (quoting Penn. Cent., 438 U.S. at 124, and Palazzolo, 533 U.S. at 636 (O'Connor, J., concurring)).

The Supreme Court in Penn Central identified three factors that have "particular significance" to this "ad hoc, factual inquir[y]." 438 U.S. at 124. First, courts must consider the character of the governmental action. Id. This is the precise action that the government has taken and the strength of the governmental interest in taking that action. Second, courts must consider the economic impact on the regulated parties. Id. Finally, courts must consider whether the regulated parties had reasonable investment-backed expectations that they would not be subjected to such regulation. Id. The Penn Central test is the same whether the regulation is permanent or

temporary in nature, although in the latter situation, the court must carefully consider the duration of the restriction under the economic impact prong. See Tahoe-Sierra, 535 U.S. at 342.

In addressing these questions, we must direct ourselves to the practical realities of the situation. That assessment can be difficult where there is a complex legislative scheme that, as here, is not a model of draftsmanship. But the fact that the legislative scheme is complex and confusing makes it all the more important to consider carefully the actual impact of the legislation on the claimants. Notwithstanding the Court of Federal Claims' careful opinion, the court has in several respects committed error.

## I ELIHPA

As an initial matter, we consider whether ELIHPA constituted a taking. The owners do not separately argue that ELIHPA constitutes a taking, and there is no basis for treating ELIHPA and LIHPRHA the same. ELIHPA was a temporary restriction that was enacted on February 5, 1988, and was only in effect until LIHPRHA was enacted on November 28, 1990. None of the owners' twenty-year prepayment deadlines expired during the period that ELIHPA was in effect, and the owners that entered into use agreements all signed the agreements well after LIHPRHA was enacted.[12] There has been no showing that ELIHPA restricted the plaintiff owners' freedom of action in any meaningful way. See Greenbrier v. United States, 193 F.3d 1348, 1357 (Fed. Cir. 1999) ("In order to successfully assert a regulatory takings claim, the Owners must establish . . . that the regulation has in substance 'taken' their property by going 'too far

[12] Cienega Gardens and Del Amo Gardens entered into use agreements on May 26, 1995. Las Lomas Gardens entered into its use agreement on May 16, 1995. Chancellor Manor entered into its use agreement on February 14, 1995.

. . . .'"). Accordingly, we find that ELIHPA did not effectuate a taking with respect to these owners.

## II LIHPRHA

The more serious question is whether the enactment of LIHPRHA constituted a taking. During the period that LIHPRHA was in effect (from November 28, 1990, until the HUD appropriations statute implementing HOPE was enacted on April 29, 1996) the plaintiff owners' twenty-year prepayment deadline expired and some of the owners, in view of the regulatory regime imposed by LIHPRHA, entered into use agreements. The question is whether these restrictions imposed by LIHPRHA resulted in a taking. In our view, in concluding that they did, the Court of Federal Claims erred as a matter of law in certain respects.

### A. Need To Consider the Effect on the Property as a Whole

We think the Court of Federal Claims erred in not considering the impact of the restriction on the property as a whole. Rather, the Court of Federal Claims compared the rate of the return that the owner would receive on its investment with and without the restriction of a single year. This error impacted the court's Penn Central analysis.

The Court of Federal Claims applied a "return-on-equity" approach, considering the income from the project for each individual year as a separate property interest. Cienega IX, 67 Fed. Cl. at 475-76. For each owner, the court compared the return on equity that the owner received under the restrictions with the return on equity that the owner would receive absent the restrictions. The court determined that, under LIHPRHA, the owner's return was limited to a six percent dividend on its initial equity investment. The court found that without the restrictions the owner could receive an 8.5

percent annual return (the Fannie Mae bond rate) on the owner's entire equity in the property at the prepayment eligibility date. The initial equity investment was significantly smaller than the entire equity value at the prepayment date because the owners had built equity in the property over the twenty-year period by making mortgage payments. Accordingly, the court found that the economic impact on the plaintiffs ranged from 90.5 to 97.7 percent. Id. at 476-78.

We believe that, in adopting this approach, the Court of Federal Claims erred. The Supreme Court, in cases like Penn Central, Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602 (1993), and Tahoe-Sierra has made clear that in the regulatory takings context the loss in value of the adversely affected property interest cannot be considered in isolation.

Penn Central, 438 U.S. 104, arose in the permanent regulatory takings context. New York City had designated Penn Central station, and the city block that it sat on, as a historic landmark site, and thus restricted development of the property. The appellants argued that the taking at issue was a taking of the air space above Penn Central station. The appellants urged that the economic impact of this restriction on developing the air space should be considered in isolation, rather than considering the property as a whole. Id. at 130. The Supreme Court rejected this approach as "quite simply untenable." Id. The Court explained:

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole—here, the city tax block

designated as the "landmark site."

Id. at 130-31.

The Supreme Court reaffirmed that the correct approach is to consider the "parcel as a whole" in Concrete Pipe, 508 U.S. at 643-44. There the Court reiterated Penn Central's holding:

> [A] claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question.

Id. at 644. The Court explained that "our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, [and] one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'" Id. (quoting Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987)); see also Andrus v. Allard, 444 U.S. 51, 65-66 (1979) ("where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety"); Seiber v. United States, 364 F.3d 1356, 1368 (Fed. Cir. 2004) ("The Supreme Court has repeatedly instructed that the impact of an alleged taking must be considered in terms of the 'parcel as a whole' . . . .").

In Tahoe-Sierra, the necessity of considering of the overall value of the property was explicitly confirmed in the temporary regulatory takings context. 535 U.S. at 331. There the petitioners argued that a thirty-two-month moratorium on building was a per se regulatory taking because there had been a complete taking of development rights during that thirty-two-month period. The Supreme Court rejected this argument stating:

> Of course, defining the property interest taken in terms of the very regulation being challenged is circular. With property so divided, every delay would become a total ban; the moratorium and the normal permit process alike would constitute categorical takings. Petitioners' "conceptual severance" argument is unavailing because it ignores Penn Central's admonition that in regulatory takings cases we must focus on "the parcel as a whole."

Id. The Court thus concluded that "the District Court erred when it disaggregated petitioners' property into temporal segments corresponding to the regulations at issue and then analyzed whether petitioners were deprived of all economically viable use during each period." Id. Justice Thomas's dissent specifically complained that the majority had improperly compared the reduction in value resulting from the regulation to the value of the parcel as a whole, i.e., the "land's infinite life." Id. at 355 (Thomas, J., dissenting). Thus we conclude that in a temporary regulatory takings analysis context the impact on the value of the property as a whole is an important consideration, just as it is in the context of a permanent regulatory taking.

The plaintiffs justify the return-on-equity approach by relying on the Supreme Court's decision in Kimball Laundry Co. v. United States, 338 U.S. 1 (1949), which held that just compensation for the taking of a laundry was "the rental that probably could have been obtained." Id. at 7. However, the reasoning of Kimball Laundry does not apply here. First, as the plaintiffs recognize, the Supreme Court in Kimball Laundry applied the return on equity approach when determining just compensation and not when determining whether a taking had occurred in the first place. Second, Kimball Laundry is a physical takings case and thus does not govern the regulatory takings context. As the Supreme Court concluded in Tahoe-Sierra, "[t]his longstanding distinction between acquisitions of property for public use, on the one hand, and

regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." 535 U.S. at 323; see also Tuthill Ranch, Inc. v. United States, 381 F.3d 1132, 1135 (Fed. Cir. 2004) ("The Supreme Court has recognized that the government may 'take' private property by either physical occupation or regulation, and that these two categories of takings are subject to different analyses.")

Consideration of the property as a whole is particularly important because our cases have established that a regulatory taking does not occur unless there are serious financial consequences. In Cienega VIII, we stated that "[w]hat has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation." 331 F.3d at 1340; see Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1177 (Fed. Cir. 1994). We previously have explained that the requirement of "severe economic deprivation" comes from the nature of regulatory takings claims, which lack "the 'typically obvious and undisputed' predicate of a physical invasion or appropriation of private property by the government" and are "in essence, a claim that 'a taking has occurred because a law or regulation imposes restrictions so severe that they are tantamount to a condemnation or appropriation.'" Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1195 (Fed. Cir. 2004) (quoting Tahoe-Sierra, 535 U.S. at 322 n.17).

We note that in a temporary taking situation, there appear to be at least two ways to compare the value of the restriction to the value of the property as a whole so as to determine if there has been severe economic loss. See Rose Acre Farms, 373

F.3d at 1188 (stating that "there are a number of different ways to measure the severity of the impact of the restrictions"). First, a comparison could be made between the market value of the property with and without the restrictions on the date that the restriction began (the change in value approach). The other approach is to compare the lost net income due to the restriction (discounted to present value at the date the restriction was imposed) with the total net income without the restriction over the entire useful life of the property (again discounted to present value). Neither approach appears to be inherently better than the other, and on remand the Court of Federal Claims should consider both as well as any other possible approaches that determine the economic impact of the regulation on the value of the property as a whole.[13]

B. Need To Consider the Offsetting Benefits

The second error committed by the Court of Federal Claims lies in its failure to consider the offsetting benefits that the statutory scheme afforded which were specifically designed to ameliorate the impact of the prepayment restrictions. This error affects all of the plaintiffs. The Court of Federal Claims characterized the government's argument as "overreaching," Cienega IX, 67 Fed. Cl. at 470, theorizing that "Congress may not establish through an option that it will provide value equal to forty, or fifty, or sixty cents on the dollar for a taking, and thereby evade paying the constitutionally-required just compensation." Id. The court stated that the value of any options the plaintiffs were offered should not "change the character of the governmental action or

---

[13] We note, however, that the Court of Federal Claims awarded Chancellor Manor $10.5 million in damages—significantly more than the property's appraised value of $7 million. See Cienega IX, 67 Fed. Cl. at 477 n.54. Logically speaking, the government cannot take more than what the plaintiffs actually possess. A determination that damages exceed the value of the property should be indicative that

the way that the Penn Central takings analysis is applied." Id. The court held instead that any benefits "should be addressed in the determination of just compensation," not as part of the takings analysis. Id.

The Supreme Court in Penn Central, 438 U.S. at 137, clearly held that offsetting benefits must be accounted for as part of the takings analysis itself. There, in exchange for restrictions on the development of historic properties, New York City's zoning laws provided developers with the right to develop nearby parcels that the developer already owned. Id. at 113-14. The Court explained that "to the extent appellants have been denied the right to build above the [Penn Central] Terminal, it is not literally accurate to say that they have been denied all use of even those pre-existing air rights." Id. at 137. Thus, the plaintiff's "ability to use these rights has not been abrogated; they are made transferable to at least eight parcels in the vicinity of the Terminal." Id. The Court concluded that these benefits "undoubtedly mitigate whatever financial burdens the law has imposed on appellants and, for that reason, are to be taken into account in considering the impact of the regulation." Id.

The Court of Federal Claims did not take into account this aspect of the Penn Central decision, finding support for its holding instead in our decisions in Whitney Benefits, Inc. v. United States, 926 F.2d 1169 (Fed. Cir. 1991), and Whitney Benefits, Inc. v. United States, 752 F.2d 1554 (Fed. Cir. 1985). The Whitney Benefits cases provide no support for the Court of Federal Claims' approach. At issue in the Whitney Benefits cases was a statute that prevented a land owner from mining its property, but, in exchange, the Department of the Interior was authorized "to agree with such [land

---

the method of computing damages is flawed.

owners] to convey the fee to, or lease in exchange, other federal land embodying coal deposits." Whitney Benefits, 752 F.2d at 1555. This court stated that the value of the new property offered in exchange for the restriction could not be considered under the takings analysis because "the exchange transaction is a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself, and is optional with the claimants." Whitney Benefits, 926 F.2d at 1175; see also Whitney Benefits, 752 F.2d at 1560. However, unlike in Penn Central where the benefits were tied to the property already owned by the affected parties, in Whitney Benefits the government offered those parties new properties.

This case does not involve a transfer of new property to the owner as in Whitney Benefits, but rather an amelioration of the restrictions imposed on the existing property. There can be no claim here that the government compensated the owner by providing substitute property. The benefits must be considered as part of the takings analysis.[14]

The Court of Federal Claims, we think, overstated the effect of the statute when

---

[14] Such benefits, of course, would be pertinent as well to a just compensation analysis if a taking had occurred. In Cienega VIII, we held that a taking had occurred with respect to the model plaintiffs (two of which had entered into use agreements under LIHPRHA—Sherman Park and St. Andrews), and directed the Court of Federal Claims to enter the damages awarded in Cienega III, 38 Fed. Cl. 64. See Cienega VIII, 331 F.3d at 1353. On remand, the Court of Federal Claims reinstated the damages award for the model plaintiffs, and we reviewed that award in Independence Park Apartments v. United States, 449 F.3d 1235 (Fed. Cir. 2006). There we stated that, for purposes of determining just compensation, "the calculation of damages should be adjusted [for the two model plaintiffs that entered into use agreements] to treat the ban on prepayment as lasting as long as the use agreements provided for, with the amount of the damages adjusted to account for any benefits . . . obtained as a result of the use agreements." Id. at 1248. However, the Independence Park decision does not suggest that these benefits should not also be considered as part of the takings analysis.

it concluded that "[n]one of the options available to plaintiffs permitted them to exercise their right to transfer their property to a purchaser of their choice." Cienega IX, 67 Fed. Cl. at 467. As a practical matter LIHPRHA provided owners with two alternatives: (1) the right to sell the property at its fair market value or, if there was no offer or if HUD failed to provide financial assistance to the purchasers, the right to prepay the mortgage and eliminate the regulatory restrictions; or (2) entering into a use agreement with HUD under which HUD would provide financial incentives to the owner. See 12 U.S.C. §§ 4107, 4110 (2000).

With respect to the first option, the owners here do not dispute that the opportunity for a fair market value sale would eliminate any takings claim. See Florida Rock Indus., Inc. v. United States, 791 F.2d 893, 903 (Fed. Cir. 1986) ("if there is found to exist a solid and adequate fair market value [for the property] which [the owner] could have obtained from others for that property, that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred or that any just compensation had to be paid by the government"). Rather the owners complain that sale to qualified buyers was unlikely, that the sale process took time during which the rent and other restrictions remained in place, that appraisal value was not adjusted over the course of the two-year sale period, and that prepayment was not possible until the sale process was complete (and unsuccessful). However, any trouble finding a buyer only increased the probability that the owner would be able to prepay if a sale was not completed.

Moreover, the sale process was not as time consuming as the plaintiffs assert.

To reduce any administrative delays, LIHPRHA permitted the owners to begin the sale process by filing a notice of intent up to two years before their prepayment eligibility date. 12 U.S.C. § 4119(1)(B) (2000). The owners and HUD would then appraise the property to determine "the fair market value of the housing based on the highest and best use of the property." Id. § 4103(b)(2). Upon HUD's approval of the sale, the owner would file a second notice of intent with HUD.[15] Id. § 4106(d)(1). This triggered a fifteen month period for which the owner was required to keep the offer to sell open. Id. § 4110(b)(1). First, the owner was required to make an offer to sell to a "priority purchaser" for twelve months. Id. § 4111(b)(1). A "priority purchaser" was a resident council organization or a nonprofit organization "that agrees to maintain low-income affordability restrictions for the remaining useful life of the housing." Id. § 4121(a). The negotiated sale price could not exceed the appraised value of the property. Id. § 4110(b)(1). If no priority purchaser made an offer, the owner was required to hold the offer open for three additional months to any "qualified purchaser." Id. § 4110(c). A "qualified purchaser" was "any entity that agree[d] to maintain low-income affordability restrictions for the remaining useful life of the housing." Id. § 4121(b). If no sale was completed after fifteen months, the owner could then prepay the mortgage. Alternatively, if HUD failed to provide assistance to the purchasers to enable them to complete the sale, the owner also could prepay the mortgage. Id. § 4114(a)(1)(B). However, the prepaying owner could not raise the rents for any tenants who were

---

[15] The requirement for HUD approval of the sale did not substantially affect the process. If HUD approval was not forthcoming, the various options were still largely available. In effect, the owner could still offer the property for sale and prepay if the sale did not occur. The only lost opportunity was apparently the ability to negotiate the price. See 12 U.S.C. § 4111(b)(1), (c).

residents when the owner filed its notice of intent to sell the property for three years. Id. §§ 4113(c)(1), 4114(a).

The duration of these restrictions is an important factor in the takings analysis. The Supreme Court in Tahoe-Sierra concluded that "the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." 535 U.S. at 342; see also Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1195 (Fed. Cir. 2004) (instructing the trial court to consider the temporary nature of the restriction—two years—on remand). Thus to the extent that owners could initiate and complete the process near the original prepayment date and sell the property for fair market value, the restriction had no practical significance beyond the three-year restriction on raising rents and the requirement that the owner pay a portion of tenants' relocation expenses. On remand, the Court of Federal Claims should assess whether the sale process prescribed by LIHPRHA provided the opportunity for a fair market value sale at or near the original prepayment date.

Alternatively, an owner could enter into a use agreement. The owner was required to file a "plan of action."[16] 12 U.S.C. § 4107(a) (2000). This plan of action included the types of financial incentives requested. Id. § 4107(b)(1)(A)-(F). These incentives included the right to earn higher dividends, rent increases for current tenants, repair and capital improvement loans, and second mortgages.[17] LIHPRHA required

---

[16] The owner was required to file the plan of action within six months of HUD's determination that the preservation rents were within the federal cost limit. 12 U.S.C. § 4107(a) (2000).

[17] Specifically, LIHPRHA authorized HUD to provide the following incentives: increased access to residual receipts accounts; an increase in the rents permitted

HUD to approve the plan if it was "the least costly alternative that [was] consistent with the full achievement of the purposes of this title" and if the owner made a binding commitment to extend the restrictions on the property, including agreeing that "the housing [would] be retained as housing affordable for very low-income families or persons, low-income families or persons, and moderate-income families or persons for the remaining useful life of such housing." Id. § 4112(a)(1)-(2). If HUD approved the plan but did not provide the funding incentives within fifteen months, the owner could prepay the mortgage. Id. § 4114(a)(1)(A). If the owner did prepay under this circumstance, as with a sale, the owner was still prohibited from raising rents on any existing tenants for three years following prepayment and was required to pay fifty percent of relocation expenses. Id. § 4113(b), (c)(1).

The sale and use agreement options thus conferred considerable benefits on the owners. The major effect of the statute on an owner who did not elect to enter into a use agreement and wished to prepay was to keep the restrictions in place during the sale period which might expire near the prepayment date; to compel the owner to offer the property for sale at a fair market value; and, if there was no sale (and the owner

---

under an existing contract under section 1437f of Title 42, or additional assistance under section 1437f of title 42 or an extension of any project-based assistance attached to the housing (subject to the availability of amounts provided in appropriations Acts); an increase in the rents on units occupied by current tenants as permitted under section 4112 of LIHPRHA; financing of capital improvements under section 201 of the Housing and Community Development Amendments of 1978; financing of capital improvements through provision of insurance for a second mortgage under LIHPRHA; in the case of housing defined in section 4119(1)(A)(iii) of LIHPRHA, redirection of the Interest Reduction Payment subsidies to a second mortgage; access by the owner to a portion of the preservation equity in the housing through provision of insurance for a second mortgage loan insured under section 1715z-6(f) of LIHPRHA or a non-insured mortgage loan approved by the Secretary and the mortgagee; or other incentives authorized in law. 12 U.S.C. § 4109(b) (2000).

prepaid the mortgage), to restrict rent increases for a three-year period. This sale option was plainly an available alternative because many owners in fact elected to sell their property. See Cienega IX, 67 Fed. Cl. at 444 (noting that of a group of 205 to 210 projects in California, 37 percent intended to sell); see also Cienega Gardens J.A. at 103174 (testimony by Richard Mandel, from the California Housing Partnership Corporation, that he was not "aware of any [properties involved in the sale process] that did not receive a bona fide offer").

The benefits to the owners electing to enter into use agreements were also considerable, as confirmed by the legislative history to LIHPRHA. "The bill authorize[d] an array of financial incentives" that "[t]he Committee believe[d] . . . . [would] provide sufficient economic incentive for the vast majority of owners of eligible low income housing to retain the current use and occupancy restrictions on their projects." H.R. Rep. No. 101-559, at 76 (1990); see also 136 Cong. Rec. H6053-01 (July 31, 1990) (statement of Rep. Conte) ("The provision offers a package of incentives for owners to maintain their projects as low-income housing."). When signing LIHPRHA, President Bush expressed concern that the incentives were in fact too generous:

> One important preservation strategy is to provide project owners with economic incentives to maintain their properties for low-income use. I am concerned, however, that the incentives in S. 566 are more generous than are necessary, providing excessive benefits over the long term that will be paid by all taxpayers.

Statement on Signing the Cranston-Gonzalez Nation Affordable Housing Act, 26 Weekly Comp. Pres. Doc. 1931 (Nov. 28, 1990). The President's sentiment was echoed in the hearings leading to the enactment of HOPE, where HUD's Inspector General testified that the government should "[d]iscontinue paying owners windfall

profits for projects that threaten to prepay their mortgages and remove the low income character of the units." Hearing Before the Subcomm. on VA, HUD, and Independent Agencies of the H. Comm. on Appropriations, 104th Cong., 1st Sess. (Jan. 24, 1995) (statement of Susan Gaffney, HUD Inspector General).

In summary, we think the Court of Federal Claims erred in not considering offsetting benefits with respect to those owners who entered into use agreements and those that did not. In considering whether the owners that elected to enter into use agreements suffered a taking, available offsetting benefits must be taken into account generally, along with the particular benefits that actually were offered to the plaintiffs.

C. Need To Consider the Duration of the Legislation

In its decision, the Court of Federal Claims did not consider the duration of the legislation. We believe existing takings law requires consideration of the duration of the legislation as part of the takings analysis. See Tahoe-Sierra, 535 U.S. at 342. The LIHPRHA restrictions remained in effect from November 28, 1990, until the HUD appropriations statute, implementing HOPE, was enacted on April 29, 1996.[18] Four owners did not enter into use agreements and were thus relieved of the LIHPRHA

[18] The Court of Federal Claims found that, after the enactment of HOPE, HUD "exerted strenuous efforts" to extend LIHPRHA's prepayment restriction by issuing preservation letters that refused to permit prepayment without HUD approval. 67 Fed. Cl. at 480; see id. at 445, 468. The court concluded that HUD's actions "extend[ed] the takings period beyond the enactment of HOPE." Id. at 480. We find that the Court of Federal Claims erred in extending the takings period beyond the enactment of HOPE. We have stated that "[a] compensable taking arises only if the government action in question is authorized." Del-Rio Drilling Programs Inc. v. United States, 146 F.3d 1358, 1362 (Fed. Cir. 1998). The owner's remedy for HUD's refusal to recognize the effect to the HOPE legislation was to bring an action in a United States district court under the Administrative Procedure Act challenging HUD's actions. Id. at 1363.

restrictions in April 26, 1996, when the HOPE appropriation was enacted.[19] These owners only had their prepayment rights restricted for at most a short period—from nineteen to twenty-seven months—when the legislation was in effect.[20] The Court of Federal Claims erred in not considering the duration of the legislation in deciding whether a taking had occurred. On remand, the court must consider that the owners who did not enter into use agreements were only subjected to the legislation for a limited period of 19 to 27 months.

Four of the owners elected to enter into use agreements after the enactment of LIHPRHA but before the HOPE enactment: Cienega Gardens, Del Amo Gardens, Las Lomas Gardens, and Chancellor Manor. The temporary nature of the legislation is irrelevant with respect to those who had use agreements in place when HOPE was enacted since those owners acted reasonably on the assumption that the restrictions

---

[19] These owners are Blossom Hill, Skyline View Gardens, Gateway Investors (Rivergate), and Oak Grove. Both Blossom Hill and Skyline View Gardens filed notices of intent to sign use agreements, but HUD never funded those agreements. If the incentives had remained unfunded for fifteen months, Blossom Hill and Skyline View would have been permitted to prepay their mortgages. However, HOPE was enacted before Blossom Hill and Skyline View prepaid under LIHPRHA. See Cienega IX, 67 Fed. Cl. at 450-52. Gateway and Oak Grove also filed notices of intent to sign use agreements, but they withdrew their applications upon hearing that Congress was considering the HOPE legislation. Id. at 455-56.

[20] The HOPE appropriation was enacted on April 26, 1996, and HOPE provided that owners could not raise rents for two months following prepayment. Pub. L. No. 104-120, § 2(b), 110 Stat. 834-35. Accordingly, Blossom Hill's twenty-year prepayment period expired on October 31, 1994, meaning that the restriction period lasted roughly 20 months. Skyline View's twenty-year prepayment period expired on March 15, 1994, meaning that the restriction period lasted roughly 27 months. Gateway's twenty-year prepayment period expired on June 6, 1995, meaning that the restriction period lasted roughly 19 months. Oak Grove Towers's twenty-year prepayment period expired on January 31, 1994, meaning that the restriction period lasted roughly 26 months.

were permanent.

D. Need To Consider the Nexus Between the Investment and the Expectation

Finally, the Court of Federal Claims erred in its treatment of the investment-backed expectations prong of the Penn Central analysis. See 438 U.S. at 124. In Cienega VIII, we explained that, in determining whether the plaintiffs had a reasonable investment-backed expectation, "we start with an analysis of the . . . [p]laintiffs' actual expectation because we require actual expectation of, or reliance on the government not nullifying the . . . [p]laintiffs' contractual and regulatory rights as a threshold matter." 331 F.3d at 1346. If the plaintiffs demonstrated a subjective reliance on the prepayment provision, the court was then required to "determine whether a reasonable developer in the . . . [p]laintiffs' circumstances would believe that the twentieth-year prepayment right was guaranteed by the regulations and that HUD 'authorized' and endorsed mortgage contracts expressly including it." Id. at 1348 (internal citation omitted). As with the other factors, the burden is on the owners to establish a reasonable investment-backed expectation in the property at the time it made the investment. Forest Props., Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999).

We find no error in the Court of Federal Claims' conclusion that the owners subjectively expected to have the option to prepay their mortgages after twenty years. However, we do think the Court of Federal Claims erred in part in its analysis of the reasonableness of the plaintiffs' expectations.

One important aspect of investment-backed expectations is whether, in the regulatory environment, it would be expected that the law might change to impose liability. The test in this respect was set forth at length in Commonwealth Edison Co. v.

United States, 271 F.3d 1327 (Fed. Cir. 2001) (en banc).[21] There we explained that "[t]he reasonable expectations test does not require that the law existing at the time of [entering into the program] would impose liability, or that liability would be imposed only with minor changes in then-existing law. The critical question is whether extension of existing law could be foreseen as reasonably possible." Id. at 1357. Conducting an analysis under Commonwealth, we explained in Cienega VIII that "[w]e have no evidence that the housing programs involved here were part of" such a highly regulated field that the owners' expectations were necessarily unreasonable. 331 F.3d at 1350. We concluded that the plaintiffs could not reasonably have expected the change in regulatory approach. Id.; see also Chancellor Manor, 331 F.3d at 904. We see no basis for revisiting this issue.

However, the reasonable expectations prong also requires that the expectations be investment backed, and in this regard further analysis is required. The first step of the analysis is to determine the actual investment that the general and limited partners made in the property. The second step is to determine the benefits that the owners reasonably could have expected at the time they entered into the investment. The third step is to determine what expected benefits were denied or restricted by the government action. (The latter two have been discussed earlier in this opinion.) In other words, it is impossible to determine whether the owners' expectations were reasonable without knowing the total value of the investment; its relationship to the

---

[21] While Commonwealth Edison was a due process case, we have recognized that it governs in the closely related takings area as well. See Cienega VIII, 331 F.3d at 1346 n.42; Chancellor Manor v. United States, 331 F.3d 891, 904 (Fed. Cir. 2003); see also Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1349 n.5 (Fed. Cir. 2004).

benefits available to the owners, including any tax benefits; and the anticipated benefits that were denied or restricted by the government action.[22] Finally, the claimant must establish that it made the investment because of its reasonable expectation of receiving the benefits denied or restricted by the government action, rather than the remaining benefits. The importance of this analysis is confirmed by the cases. For example, in Penn Central, the Supreme Court explained that the takings analysis requires consideration of "the extent to which the regulation has interfered with distinct investment-backed expectations." 438 U.S. at 124. The Supreme Court noted that a taking does not lie where the restriction "did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant," id. at 125, but that "a . . . statute that substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount to a 'taking.'" Id. at 127. The Court determined that the relevant investment in Penn Central was the purchase of the property before the zoning regulation was enacted and that the expectation was that it would be used as a rail terminal. Thus "the New York City law [did] not interfere in any way with the present uses of the Terminal. Its designation as a landmark . . . contemplate[d] that appellants [could] continue to use the property precisely as it ha[d] been used for the past 65 years." Id. at 136. The Court concluded that the zoning restriction did "not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel." Id. at 136 (emphasis added); see also

---

[22] In conducting this analysis, the court should consider any reduction in the return that would be the result of phantom income resulting in tax liability without the receipt of actual income. In determining the return for the general partners, the court should make allowance for any nonmonetary contributions, such as the performance of

MacLeod v. Santa Clara County, 749 F.2d 541, 547 (9th Cir. 1984) ("[I]t is clear that the denial of the permit did not interfere with MacLeod's primary 'investment-backed expectation' concerning the use of the parcel.").

Based on Penn Central, the government argues that "a taking will not lie" "where multiple uses can be expected of property, but the law does not interfere with an owner's 'primary' investment-backed expectation." Chancellor Manor Appellant's Br. at 56 (emphasis added). The owners disagree with the government's formulation of the reasonable investment-backed expectations test, and argue instead that "an expectation—even if not the 'primary' one—is nonetheless 'investment-backed' if an investor would not have invested but for the expectation." Cienega Gardens Appellees' Br. at 52. While the government's view appears to be supported by Penn Central, we need not determine at this stage in the proceeding whether the reason for the investment must be the "primary" expectation or simply that reasonable owners would not have invested "but for" the expectation for as yet the owners have not established either standard.

In addressing this question on remand, it is particularly important that the Court of Federal Claims first determine the precise scope of the benefits denied. The owners were not, as discussed earlier, entirely denied the right to prepay; rather that right was denied for a short period, and rents were frozen for a period after prepayment. The Court of Federal Claims must determine on remand whether the rights thus denied were the primary or "but for" cause of the investment. At this stage, the plaintiffs have not established that a reasonable owner's expectation of an unrestricted right of

---

services without compensation.

prepayment after twenty years would have satisfied either standard. The substantial benefits that the owners received, other than the absolute prepayment right, may well have been such that the absolute prepayment right might not have been either the primary or "but for" reason that a reasonable owner would have invested in the property. Indeed, it is not even clear that a reasonable owner would rely on any aspect of the prepayment right in making the investment, much less that a reasonable owner would rely on an unrestricted right to prepayment.

In determining whether expectations of prepayment were reasonably investment backed, it is necessary to inquire as to the expectations of the industry as a whole. Here the expert testimony on this issue was conflicting and, unfortunately, was limited to the expectations as to the general prepayment right rather than the expectations as to the limited restrictions actually imposed by the statute. On one hand, at trial the government presented the expert testimony of Kenneth Malek, an expert in tax accounting and tax-advantaged investments. He testified that "neither the general partners nor the limited partners considered residual value [of the property] to be a significant motivation." Chancellor Manor J.A. 102633. This was because "[t]he dividends that could be paid as operating cash flow distributions to the investors were limited, and so the benefits that made a material impact on the project from the standpoint of the present value of those benefits were the tax benefits and the . . . front end cash flow to the developers." Id. at 102637. He concluded that the twenty-year prepayment right "was not a material incentive." Id. at 102806. On the other hand, William Dockser, Deputy Assistant Secretary of HUD and FHA Commissioner from 1969 to 1972, testified that "the ability to discuss an exit strategy in 20 years . . . was a

reason why people would undertake to do these programs and a reason why people would invest in the programs." Id. at 500105.

The actual contemporaneous offering memoranda appear to provide more reliable evidence of industry expectations with respect to the general prepayment right (though even those do not consider the possibility of the limited restrictions imposed by the statute). Unfortunately the record contains few examples of such memoranda. But those few that are in the record are revealing. For example, when Skyline View Gardens was syndicated, the owners circulated a prospectus that touted the tax benefits of owning the property. While the prospectus assumed that the restrictions would be lifted after twenty years, it also indicated that the owners placed little value on the right to sell the property (or in the absence of a sale, the right to prepay the mortgage). The schedules demonstrating the tax benefits were based on the assumption that the partnership would sell the property after twenty-one years for only $1. Other private placement memoranda did not even assume that the property would be sold after twenty years. For example, the private placement memorandum for Gateway Investors only states that the property is subject to a forty-year mortgage without mentioning the prepayment date. These few contemporaneous documents suggest that the owners entered the programs without relying on the ability to prepay after twenty years.

The plaintiffs argue that the prospectus only described the expectations of the limited partners and not the partnership as a whole. This argument is unavailing. Under the securities laws the prospectuses were required to be truthful. See 15 U.S.C. § 77*l*(a)(2). In this respect, the prospectuses are particularly reliable. Under the

securities laws, the prospectus cannot contain any "untrue statement of a material fact or omit[] . . . a material fact." Id. This includes misstatements and omissions about the general partner's interest in the properties. See Currie v. Cayman Res. Corp., 835 F.2d 780, 783 (11th Cir. 1988) (finding material misrepresentations and omissions under 15 U.S.C. § 77*l*(a)(2) regarding a general partner's interest in a partnership). Accordingly, the prospectuses must contain any material information about both the limited and the general partners' interest in the properties, and are the most reliable indication of the relative importance of the anticipated benefits.

On remand, it is important that the parties provide the Court of Federal Claims with sufficient contemporaneous documents for the court to determine the actual investment and the expectations of the industry at the time that LIHPRHA was enacted.

CONCLUSION

For the foregoing reasons, we vacate and remand for a new Penn Central analysis under the correct legal standard. In view of our clarification of the legal standard, we conclude that on remand the Court of Federal Claims should allow both sides to supplement the record with additional relevant evidence if they wish to do so.

VACATED AND REMANDED.

COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

2006-5051

CIENEGA GARDENS, DEL AMO GARDENS, LAS LOMAS GARDENS, BLOSSOM HILL APARTMENTS, and SKYLINE VIEW GARDENS,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

---

2006-5052

CHANCELLOR MANOR, GATEWAY INVESTORS, LTD., and OAK GROVE TOWERS ASSOCIATES,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

NEWMAN, Circuit Judge, dissenting.

I respectfully dissent, for this panel has no authority to revoke our prior decision in Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) (Cienega VIII). The threshold issues here reviewed were already decided; that decision is the law of this case.

The National Housing Act of 1968 led to the program here at issue, where the federal government provided financial incentives to private investors to construct housing

to be rented to low-income tenants at rents below the market rate. The investment incentives included guaranteed 40-year mortgages from Fannie Mae at low interest, cost contributions, and other substantial economic subsidies and incentives. In return, the housing owners were limited in the rents they could charge, the income they could earn, and the changes they could make. After twenty years the owner could choose to prepay the subsidized mortgage and remove the property from the arrangement; the property owners had the unencumbered right to do so. An implementing regulation provided:

> 24 C.F.R. §236.30 (1970). A mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where . . . the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage . . . .

As the Court of Federal Claims observed, the right to leave the program after twenty years was an "incentive [that] enabled property owners to provide low-income housing for twenty years, and then terminate the low-income housing restrictions and make a long-term profit by charging market rates for rentals at the properties." Cienega Gardens v. United States, 67 Fed. Cl. 434, 440 (2005) (Cienega IX).

As twenty years approached, the owners invoked the right to prepay the mortgage and leave the plan. Congress then enacted the ELIHPA (the Emergency Low Income Housing Preservation Act of 1987), which prohibited leaving the plan, and then in 1990 the LIHPRHA (Low Income Housing Preservation and Resident Homeownership Act), which provided a partially mitigating arrangement after twenty years. The statutes are complex. This and related litigation followed; for these plaintiffs, the first Cienega Gardens case was filed in 1994. Prepayment rights were eventually restored by the Housing Opportunity Program Extension Act of 1996 (HOPE). The question of whether a constitutional "taking"

occurred during the interim period was fully discussed and finally decided in (Cienega VIII). That decision is the law of this case, as to the four "model plaintiffs" whose facts were the premises of the takings analysis, and as to the other similarly situated plaintiffs. The Cienega VIII decision and remand to the Court of Federal Claims was with instructions to apply that law to determine whether a taking occurred on the specific facts of each plaintiff, and to assess damages. In the case now on appeal there are eight plaintiffs for eight properties, including Cienega Gardens. The trial court visited the sites, conducted twenty-two days of trial, and assessed damages. Cienega IX, 67 Fed. Cl. 434 (2005) is the decision now before us.

This court in Cienega VIII resolved that the legislative enactments that forbade removing this privately-owned housing from the low-income low-rent market after twenty years, and then restored that right, were a temporary taking of property within the purview of constitutional protection. That aspect was reached and decided. This court so recognized in Independence Park Apartments v. United States, 449 F.3d 1235 (Fed. Cir. 2006):

> [In Cienega VIII] we held -- based on the factual findings made in Cienega III -- that the plaintiffs had suffered a "serious financial loss" by being deprived of the opportunity to prepay their mortgages. See Cienega VIII, 331 F.3d at 1340-45. Based on our analysis of the Penn Central factors and the extensive record already developed in the case, we ruled in favor of the plaintiffs on their regulatory takings claims.

Id. at 1239-40.

In Cienega VIII this court reviewed the "Use Agreements" that were made available by the LIHPRHA, and explored the various mechanisms whereby owners responded to the legislative changes until Congress reversed itself via the legislation enacted in HOPE. The

remand to the Court of Federal Claims was with instructions to consider these individual differences and assess damages accordingly. This court ruled that the prepayment right was "the critical inducement" to enter the program, and that "they would not have participated in the programs otherwise." Cienega VIII, 331 F.3d at 1334, 1348. Those issues are closed; these rulings bind this panel, as they bound the Court of Federal Claims in Cienega IX. After thirteen years of litigation, the remaining issue is the application of Cienega VIII and the assessment of damages; this panel has no authority to revoke Cienega VIII.

My colleagues acknowledge that this court in Cienega VIII ruled that "the four model plaintiffs had suffered a compensable temporary regulatory taking," maj. op. at 12, but state that this court acted "on a partial record and limited arguments made by the government," apparently impeaching the parties, the trial court, and ourselves. This is as unwarranted as it is incorrect. In Independence Park Apartments, 449 F.3d at 1240, another panel of this court remarked on "the extensive record already developed in the [Cienega] case." If there indeed were inadequate arguments by the government and an incomplete record at trial, the concern should have been raised by the panel in that appeal, not four years later when the trial court has acted on and fulfilled the remand instructions, conducted lengthy proceedings, and completed a thorough application of this court's decision in accordance with its terms. See Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986) (if the appellate court is dissatisfied with the adequacy of the record and is unable to reach a proper resolution of the legal question, the proper course is to remand to the trial court). Review of the eight Cienega cases makes clear that the record and

presentation in Cienega VIII cannot be discarded as "partial" and "limited," for they were thorough and complete, as well as built on the seven earlier Cienega trials and decisions.

On this appeal, the government repeats the arguments it presented in Cienega VIII, shifting its emphasis to the argument that the congressional goal of protecting low-income tenants served an "important public interest." In Cienega VIII this court agreed: "Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners." 331 F.3d at 1338. This court explored whether this was "the kind of expense-shifting to a few persons [that] amounts to a taking," id. at 1338-39, and applied the principles of Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922) that the "strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change," id. at 416. As reiterated in Lingle v. Chevron U.S.A., Inc., 544 U.S. 528 (2005), "the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose." Id. at 543.

The Constitution assures that when the government changes its obligations to private entities with which it has entered into contractual and other specific relationships, the government is as responsible for its direct violation of those relationships as would be any private person. See Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 607-08 (2000) (the United States is bound by the same principles of contract law as in contracts between private persons). Legislative abrogation of property rights, albeit for public purpose, is tolerated because the Constitution assures that the contracting party is not required to bear the burdens of the public as a whole. In Winstar v.

United States, 518 U.S. 839 (1996) the Court explained: "Just as we have long recognized that the Constitution 'bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole,' so we must reject the suggestion that the Government may simply shift costs of legislation onto its contractual partners who are adversely affected by the change in the law, when the Government has assumed the risk of such change." Id. at 883 (quoting Dolan v. City of Tigard, 512 U.S. 374, 384 (1994)).

The issues on this appeal are limited to the application by the Court of Federal Claims of the remand instructions of Cienega VIII. Instead, this court proposes that the trial court redecide the basic question of whether a taking occurred at all.[1] No new arguments have been presented, nor any previously unavailable factual information, nor any other basis for reopening what is closed. It is singularly unfair to these plaintiffs to require them to start again, after thirteen years of judicial process.

The issue of this appeal, the appropriate measure of damages, is barely touched. The trial court received extensive briefing and argument and evidence, including expert testimony from all sides. The court gave weight to the partial mitigation by those owners who accepted the "Use Agreements," and evaluated the issues of the owners who sold their properties while the law was in effect. A serious flaw in the majority's analysis is its blurring of the distinction between liability and damages, resulting in its skewed approach to the takings analysis. The panel majority's new requirement that the owners must prove

---

1 The court is not here acting *en banc*; we simply consolidated the two appeals and enlarged the panel. *En banc* action is required to overturn prior final decisions.

that the right to leave the program after twenty years was "the primary incentive" for their initial participation in the program is contrary to all of the rules of evaluating integrated contractual arrangements, for each provision and obligation is deemed significant to the whole. Whatever weight a party may have given to each of the complex restrictions and benefits, this absolute prepayment right was included in all of the arrangements. The prepayment right has been demonstrated, by the experience of this litigation, to be of large economic significance. The prepayment right was included in all of the relevant documents and prospectuses, as well as in the authorizing legislation and regulations. It is not disputed that the removal of this condition spawned this litigation.

My colleagues apply another incorrect premise, for the value of property is measured when it is taken. See First English Evangelical Lutheran Church of Glendale v. Los Angeles County, 482 U. S. 304, 320 (1987) ("the valuation of property which has been taken must be calculated as of the time of the taking"); Almota Farmers Elevator & Warehouse Co. v. United States., 409 U.S. 470, 474 (1972) ("the owner is entitled to the fair market value of his property at the time of the taking.") We need not speculate whether the government would have designed a different arrangement in 1968 had the future housing situation been foreseen, or what variation in incentives would have been needed to obtain private participation; the panel majority errs in suggesting that because some other terms might have obtained the required low-rent housing, those other terms now determine the economic consequences of legislative annulment of the terms that were actually put into place.

The creative theories propounded by my colleagues for redetermining whether a taking occurred ignore the law of this case, as well as the constitutional authority that holds the government to its obligations. I must, respectfully, dissent.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

By: [signature] Date: 11/16/07